UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| RANDY M. SWISHER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CAUSE NO. 3:10-CV-337-MGG |
| | ) | |
| PORTER COUNTY SHERIFF'S | ) | |
| DEPARTMENT, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

Randy M. Swisher, *pro se*, submitted a complaint under 42 U.S.C. § 1983 while he

was incarcerated.[1] He was granted leave to proceed against Dr. Madir H. Al-Shami,

Sheriff David Lain, and Warden John Widup in their individual capacities for

compensatory and punitive damages for denying him medical treatment for his hernia,

back pain, sinus headaches, foot pain, and post-traumatic stress disorder caused by his

reaction to skin cancer and surgeries while he was housed at the Porter County Jail in

violation of the Fourteenth Amendment. He was also granted leave to proceed against

the Porter County Sheriff's Department and Advanced Correctional Healthcare

Corporation for compensatory and punitive damages for having policies which

preclude treatment of a non-life-threatening hernia, treatment of inmates by non-jail

doctors, prescription of over-the-counter pain medications, and issuing two mattresses

to an inmate while he was housed at the Porter County Jail in violation of the

---

[1] Swisher was subsequently released from custody.

Fourteenth Amendment. Sheriff David Lain, Warden John Widup, and Porter County Sheriff's Department (Porter County Defendants) filed a motion for summary judgment. (ECF 338.) Dr. Madir H. Al-Shami and Advanced Correctional Healthcare Corporation (Medical Defendants) have also filed a motion for summary judgment. (ECF 331.) Both summary judgment motions were accompanied by notices (ECF 333 and 340), as required by N.D. Ind. L.R. 56.1(f), which informed Swisher of the importance of responding. Swisher has responded to each of the motions, and the defendants have replied. For the following reasons, the court grants both summary judgment motions.

Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Federal Rule of Civil Procedure 56(a). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Not every dispute between the parties makes summary judgment inappropriate; "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* To determine whether a genuine issue of material fact exists, the court must construe all facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Ogden v. Atterholt*, 606 F.3d 355, 358 (7th Cir. 2010). A party opposing a properly supported summary judgment motion may not rely merely on allegations or denials in his or her own pleading, but rather must "marshal and present the court with the evidence she contends will prove her

case." *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). If the nonmoving party does not establish the existence of an essential element on which that party bears the burden of proof at trial, summary judgment is proper. *Massey v. Johnson*, 457 F.3d 711, 716 (7th Cir. 2006). Summary judgment "is the put up or shut up moment in a lawsuit ...." *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008).

Facts

On January 1, 2008, Swisher suffered a gunshot wound in an incident that led to his arrest. (ECF 339-2 at 37.) He was immediately taken to Porter Hospital in Valparaiso, Indiana, for medical treatment. (*Id.*) The hospital discharged Swisher on January 15, 2008. (ECF 339-2 at 38.) Swisher does not recall receiving any instructions regarding his care and treatment at that time. (ECF 339-2 at 37.) Following his discharge, Swisher was booked into the Porter County Jail. (ECF 339-2 at 37; ECF 339-4 at 2.) Swisher remained at the Porter County Jail from January 2008 until September 30, 2008. (ECF 262 at ¶ 9.)

During the intake and booking process, Swisher reported that he had a "mini stroke" in August, which caused him to fall into a pillar and knock out his teeth. (ECF 339-2 at 39.) He was never diagnosed with a stroke, but that is what Swisher believes happened. (ECF 339-2 at 39-40.) He also reported that he previously had cancer. (ECF 339-2 at 40.) And, Swisher reported that he is "mostly blind," or legally blind, without his glasses. (ECF 339-2 at 39-40.) He does not recall whether he indicated to any booking officer that he was taking medications prior to his arrest. (ECF 339-2 at 41.) Swisher did

not report any other medical problems at the time of his intake and booking. (ECF 339-2 at 39.)

The day after Swisher arrived at the Porter County Jail, he was seen by a doctor[2] for treatment and examination of his gunshot wound. (ECF 339-2 at 49.) He was prescribed Tylenol, Ibuprofen, and two different antibiotics. (ECF 332-1 at ¶ 6; ECF 332-2 at 5.) Swisher has no complaints regarding his medical treatment on January 16, 2008. (ECF 339-2 at 50.) Although he does not specifically remember it, Swisher believes that his wound was cleaned by nursing staff in the days following his arrival at the jail. (*Id.*)

The Porter County Jail received Swisher's records from his hospital stay on January 23, 2008. (ECF 332-2 at 7-180.) The records showed that he had a history of medication abuse and skin cancer. (ECF 332-1 at ¶ 7; ECF 332-2 at 7-180.) The records also showed that a psychiatric evaluation was performed, but he did not have a specific mental health diagnosis. (*Id.*)

Swisher sought medical care in February for surgical pain and hypoglycemia, and saw Dr. Nadir Al-Shami[3] on February 25, 2008. (ECF 339-2 at 53; ECF 339-4 at 4-8.) Dr. Al-Shami ordered that his blood sugar be tested twice a day for three days, and that his blood pressure be checked for three days. (ECF 332-1 at ¶ 8; ECF 339-4 at 8.)

---

[2] Records suggest Nurse Cheryl Casko, not a doctor, examined Swisher but that dispute is not material to the outcome of the instant motions. (ECF 332-2 at 5.)

[3] Dr. Al-Shami is licensed to practice in Indiana and was employed by Advanced Correctional Healthcare, Inc., a company that provides physicians for county jails in Indiana. (ECF 332-1 at ¶ 2.) At the time Swisher was housed at the Porter County Jail, Dr. Al-Shami served as the primary care physician for each inmate housed in the jail. (*Id.* at ¶ 3.)

Swisher's complaints regarding his blood sugar were addressed and he has no complaints about how this was handled. (ECF 339-2 at 53.)

On March 2, 2008, Swisher submitted a Medical Request Form asking to see a chiropractor for back pain that was worsening and affecting his sleep. (ECF 339-2 at 54-55; ECF 339-4 at 10.) The Porter County Jail did not have a chiropractor on staff. (ECF 339-3 at ¶ 9.) Nurse Cheryl Casko informed Swisher that he would need to speak with his attorney to get a court order for his family to take him to a chiropractor.[4] (ECF 339-4 at 10.) Swisher was representing himself and did not seek a court order. (ECF 339-2 at 55.) Swisher's March 2, 2008, request was never brought to Dr. Al-Shami's attention. (ECF 332-1 at ¶ 10.) Swisher does not recall making any other written requests for care regarding his back pain. (ECF 339-2 at 56.) He does claim, however, that he spoke with Dr. Al-Shami regarding his back pain during later visits.[5] (ECF 339-2 at 56.)

Within a month after submitting his March 2, 2008, Medical Request Form, Swisher spoke with Warden Widup regarding his request to see a chiropractor and was told: "'We can't get specialists in here' type thing. They won't have specialists come to the jail." (ECF 339-2 at 57-58.) Warden Widup also told Swisher that he would talk to "medical" regarding Swisher's complaint. (ECF 339-2 at 58.) Swisher was left with the

---

[4] Despite Nurse Casko's comment, Dr. Al-Shami asserts that Swisher did not need a court order to receive specialty care. (ECF 332-1 at ¶ 10.)

[5] Dr. Al-Shami denies this. (ECF 332-1 at ¶17.) He claims that, if Swisher had complained to him about back pain, he would have made a determination about what treatment was necessary, including whether he needed to see a specialist. (ECF 332-1 at ¶10.) For purposes of the instant motions, Swisher's version of the facts is accepted as true. *Ogden*, 606 F.3d at 358.

impression that it was against policy to allow specialists to come to the jail. (ECF 342 at 2.)

On April 4, 2008, Swisher submitted a Medical Request Form stating that, "medical problems have developed since my last request." (ECF 339-2 at 62; ECF 339-4 at 12.) He complained of an infection and foot pain. (*Id.*) He wrote that "I will soon need a pair of crutches because my feet are becoming incapable of supporting my weight." (*Id.*) Swisher explained at his deposition that, "at that point [his] feet were hurting so bad [he] couldn't hardly walk on 'em." (ECF 339-2 at 62.) Dr. Al-Shami saw Swisher on April 7, 2008. (ECF 339-2 at 62-63; ECF 339-4 at 14.) Swisher does not recall the specifics of this appointment. (ECF 339-2 at 63.) At his deposition, Swisher stated that he believes his foot problems were discussed, but Dr. Al-Shami did not prescribe anything. (ECF 339-2 at 63.) In his response to the summary judgment motion, Swisher asserts that he also told Dr. Al-Shami about his back and head pain at the April 7, 2008, appointment. (ECF 341 at 1.) Furthermore, Swisher claims that Dr. Al-Shami did not provide any treatment and refused to allow him to see specialists for his ailments.[6] (ECF 339-2 at 56-57, 63; ECF 341 at 1.) It is undisputed that Dr. Al-Shami never observed Swisher having difficulty ambulating. (ECF 332-1 at ¶ 17.) Although the time-line is not clear, Swisher

---

[6] Dr. Al-Shami remembers the April 7, 2008, visit differently. Dr. Al-Shami claims that Swisher never complained to him of foot pain. (ECF 332-1 at ¶ 17.) And, according to Dr. Al-Shami, on April 7, 2008, the only specific medical issue that Swisher mentioned to him was a possible gum infection. (ECF 332-1 at ¶ 12.) He was prescribed Amoxicillin and CTM (an antihistamine) for seven days. (ECF 332-1 at ¶ 12; ECF 339-4 at 14.) He was instructed to notify the dentist if the problem persisted. (*Id.*) Again, Swisher's version of the facts is accepted as true for purposes of the instant summary judgment motions. *Ogden*, 606 F.3d at 358.

testified that he spoke with Warden Widup about his foot pain and need to have arch supports made at some point. (ECF 339-2 at 90.)

On either March 4, 2008, or April 16, 2008, Swisher was seen by a nurse for a comprehensive medical examination and history. (ECF 339-2 at 64-65; ECF 339-4 at 15.) Swisher reported having sinusitis and headaches, previous skin cancer, and a diagnosis of hypoglycemia in 1982. (ECF 339-4 at 15.) He also indicated that he needed arch supports from a podiatrist and he needed to see a chiropractor for a back injury. (*Id.*)

On April 27, 2008, Swisher submitted a Medical Request Form that indicated he needed to see the doctor as soon as possible, but did not indicate the nature of his concern. (ECF 339-4 at 17.) Swisher received a response the following day that he would be placed on the doctor's list. (ECF 339-2 at 67; ECF 339-4 at 17.)

Swisher was seen by Dr. Al-Shami on May 5, 2008. (ECF 339-2 at 68; ECF 339-4 at 19.) Swisher's primary complaint at that time was an abdominal frontal hernia. (ECF 339-2 at 68-69; ECF 332-1 at ¶ 13.) Swisher claims he looked like he was eight or nine months pregnant, although Dr. Al-Shami's notes indicate the hernia measured 5 centimeters by 5 centimeters. (ECF 339-2 at 68-69; ECF 339-4 at 19; ECF 341 at 2.) The hernia was reducible and therefore not at risk for strangulation or incarceration. (ECF 332-1 at ¶ 13.) A reducible hernia is one that goes back into the hole on its own when the patient lays flat or one that can be easily pushed back into the hole.[7] (*Id.*) A reducible

---

[7] It is not clear how Dr. Al-Shami determined that the hernia was reducible. Swisher says Dr. Al-Shami "never even lifted a finger to see if [his] stomach would push in and stay in." (ECF 341 at 2.) Swisher, however, has not asserted that the hernia was not reducible.

hernia is not at risk for becoming incarcerated or strangulated, or where the hernia tissue becomes trapped in the hernia sack. (*Id.* at ¶¶ 13, 22.) A hernia is non-strangulating or not incarcerated if it can be easily manipulated and does not impede bowel movement or function or affect other organs. (*Id.* at ¶ 22.) Hernias that are incarcerated or strangulated need to be surgically repaired. (*Id.* at ¶ 13.) Hernia surgery is generally elective. (*Id.* at ¶ 22.) Hernias that are not strangulating or incarcerated and are reducible can be and are frequently safely managed with conservative care. *(Id.* at ¶¶ 13, 22.) Conservative care consists of monitoring the size of the hernia, a hernia belt or bandage/wrap, pain management if necessary, and possible activity restriction. (*Id.* at ¶ 22.) Dr. Al-Shami did not order surgery for Swisher's hernia. (ECF 339-2 at 70; ECF 339-4 at 19; ECF 332-1 ¶ 13.) Swisher was, however, prescribed an ACE bandage to wrap around his stomach and Tylenol. (ECF 339-2 at 70-71; ECF 339-4 at 19.) The bandage was ordered on May 7, 2008, and provided to Swisher on May 29, 2008. (ECF 332-2 at 192.) According to Swisher, Dr. Al-Shami said that it was against policy to surgically repair the hernia unless it was life threatening. (ECF 341-1 at ¶ 10.) Further, Swisher's request to get a second opinion was denied. (ECF 339-2 at 48, 69.)

Immediately following Swisher's appointment with Dr. Al-Shami on May 5, 2008, Swisher spoke with Ian Widup, a jail deputy, about the doctor not providing Swisher with treatment[8] for his hernia and Ian Widup responded that he would talk to

---

[8] While Swisher repeatedly indicates he received no treatment for his hernia, it is undisputed that he received treatment. (ECF 339-2 at 70-71; ECF 339-4 at 19.) Swisher equates a lack of surgical repair with a lack of treatment. (*See* ECF 341-1 at ¶¶ 4, 10.)

his father, Warden Widup, and "get it straightened out." (ECF 339-2 at 47-48, 72, 92-93.) Later on – he does not know how many days – he spoke with Warden Widup personally, showed him his stomach, and told him that his hernia was not being treated. (ECF 339-2 at 72, 93; ECF 341-1 at ¶ 6.) Swisher also asserts that his sister, Bonnie Work, notified Warden Widup of his hernia and need for treatment, and she later confirmed that she talked with the warden. (ECF 339-2 at 72; ECF 341-1 at ¶ 6.)

Medical records indicate that Dr. Al-Shami examined Swisher on June 2, 2008.[9] (ECF 339-4 at 21; ECF 332-2 at 193; ECF 332-1 at ¶ 14.) Swisher denies this, but the dispute is not material. (ECF 341 at 1.) Whether Swisher saw Dr. Al-Shami or not, it is undisputed that Dr. Al-Shami ordered an abdominal belt for Swisher on June 2, 2008. (ECF 339-4 at 21; ECF 332-1 at ¶ 14.) The abdominal belt was ordered to keep the Ace bandage in place, because Swisher said it rolled.[10] (*Id.*) The belt was provided that day. (ECF 332-2 at 193, 201-02; ECF 339-2 at 73; ECF 339-4 at 21.) Dr. Al-Shami instructed the nursing staff to check each day to see if Swisher was wearing the belt, and to vary the times they checked. (ECF 332-1 at ¶ 14.) Swisher wanted the hernia belt, and he wore a hernia belt for the next seven years in each of the subsequent correctional facilities where he was housed. (ECF 339-2 at 74-76.)

---

[9] According to the medical records, Swisher's hernia was still reducible and had not grown in size, so it remained at low risk for incarceration or strangulation. (ECF 332-2 at 193; ECF 332-1 at ¶ 14.)

[10] The medical records suggest that the hernia belt was intended to replace rather than supplement the Ace bandage, but this is immaterial to the outcome of the summary judgment motions. (ECF 332-2 at 201-03.)

On June 2, 2008, Swisher filed an Emergency Petition for Bond Reduction in Porter Superior Court. (ECF 342-1.) That motion sets forth numerous medical problems including pain management for skin cancer surgeries, sinusitis, chronic back pain, foot pain, hypoglycemia, dental problems, and vision problems. (*Id.*) The Emergency Petition for Bond Reduction makes no mention of Swisher's hernia. (*Id.*)

On June 22, 2008, Swisher sent a Notice of Tort Claim by certified mail to the Porter County Jail, naming "Porter Co. Sheriff, Physician, Head Nurse, Warden, and Day Shift Commander-Captain" as defendants. (ECF 342-1 at 3.) For reasons that are not clear, Swisher withheld the names of the defendants for "security reasons" but offered to "disclose by court order if I decide to pursue with litigation." (ECF 342-1 at 3.) The Notice of Tort Claim does not describe any particular medical issues. Instead, it references "ongoing refusal of medical treatment and supplies," a lack of access to necessary specialists, and incompetence on the part of the jail doctor. (*Id.*)

On August 19, 2008, Swisher submitted a request to see the doctor regarding his stomach. (ECF 339-2 at 78; ECF 339-4 at 23.) Medical records demonstrate that Swisher was seen by Dr. Al-Shami on August 25, 2008.[11] (ECF 339-2 at 79-80; ECF 339-4 at 25.) Swisher does not recall any specifics about his complaints at this appointment, although

---

[11] While Swisher initially denied that he saw Dr. Al-Shami after the May 5, 2008, appointment, at his deposition he conceded that he was mistaken and that he was in fact seen on August 25, 2008. (ECF 339-2 at 79-80.) Despite that concession, in response to the Medical Defendants' summary judgment motion, he again claims that he never saw Dr. Al-Shami after May 5, 2008. (ECF 341 at 2.) Because Swisher's later statement in his affidavit directly contradicts his earlier deposition testimony, it will be disregarded. *See Bank of Ill. v. Allied Signal Safety Restraint Systems*, 75 F.3d 1162, 1168-69 (7th Cir. 1996)("We have long followed the rule that parties cannot thwart the purposes of Rule 56 by creating 'sham' issues of fact with affidavits that contradict their prior depositions.").

he speculates it was about the hernia belt and pain from the hernia. (ECF 339-2 at 80.) According to Dr. Al-Shami, Swisher complained of sinus headaches and asked about a specific medication for his sinus headaches.[12] (ECF 332-1 at ¶ 15.) Swisher was prescribed Tylenol, Ibuprofen, and Benadryl for sinus headaches. (ECF 332-1 at ¶¶ 15, 17; ECF 339-4 at 25.) And, according to Dr. Al-Shami, at the August 25, 2008, appointment Swisher asked why he could not have his hernia repaired. (ECF 332-1 at ¶ 15; 339-4 at 25.) Dr. Al-Shami explained that Swisher's hernia did not need to be surgically repaired, but if it became non-reducible and at risk of strangulation or incarceration, surgery would be needed. (ECF 332-1 at ¶ 15.) Swisher does not recall discussing his medical complaints with anyone at the jail after this visit. (ECF 339-2 at 82.)

At no point did Swisher inform Dr. Al-Shami that he had been diagnosed with post-traumatic stress disorder. (ECF 332-1 at ¶ 17.) In fact, Swisher testified that, prior to his arrest, he had not ever had a mental health diagnosis of any kind. (ECF 339-2 at 33.) Dr. Al-Shami did not diagnose Swisher with post-traumatic stress disorder and did not see Swisher exhibit signs or symptoms of post-traumatic stress disorder. (ECF 332-1 at ¶ 17.)

During the course of his treatment of Swisher, Dr. Al-Shami, an experienced physician, based his diagnoses and treatment decisions on Swisher's subjective complaints, objective conditions, and his reasoned medical judgment. (ECF 332-1 at ¶

---

[12] Dr. Al-Shami asserts that this was the only time Swisher complained to him of sinus headaches, but Swisher disputes this. (ECF 332-1 at ¶¶ 15, 17; ECF 341 at 1.)

18.) Dr. Al-Shami's treatment decisions regarding Swisher were not based on any policy, practice, procedure or custom of Advanced Correctional Healthcare or the Porter County Sheriff. (ECF 332-1 at ¶ 21.) Dr. Al-Shami's treatment decisions regarding Swisher had nothing to do with cost or monetary concerns. (*Id.*) Dr. Al-Shami prescribed whatever medication or treatment he thought was appropriate, regardless of cost. (*Id.*)

Swisher indicates he "was told by medical personnel that it was against policy to prescribe an over-the-counter medication for [his] chronic headaches." (ECF 341-1 at ¶ 7.) It is not clear who told Swisher this, but according to Dr. Al-Shami, there was no Advanced Correctional Healthcare policy regarding prescription of over-the-counter medications. (ECF 332-1 at ¶ 15.) Dr. Al-Shami could prescribe whatever medications he wanted to, whether or not those medications were also available over the counter or from the Commissary. (*Id.*) And, he did prescribe over the counter medications for Swisher. (ECF 332-1 at ¶ 17; ECF 339-4 at 25.)

Swisher believes there is a policy preventing inmates from going outside of the jail for specialty care. (ECF 341-1 at ¶ 7.) Dr. Al-Shami has indicated that there was no such policy. (ECF 332-1 at ¶ 21.) As the inmates' medical provider, Dr. Al-Shami used his medical experience and judgment to determine whether a patient needed to be sent offsite for specialty care. (*Id.*) In Dr. Al-Shami's opinion, Swisher never needed to be sent outside of the jail for specialty care. (*Id.*)

Swisher says that Dr. Al-Shami told him that "the policy was that no surgery for a hernia would be given unless the condition became life-threatening." (ECF 341-1 at ¶

10.) According to Dr. Al-Shami, there was no Advanced Correctional Healthcare policy regarding how to treat hernias. (ECF 332-1 at ¶ 21.) Dr. Al-Shami used his experience and medical judgment to determine whether a patient's hernia needed surgical repair or could be managed conservatively. (*Id.*) If Swisher's hernia had become much bigger in size, non-reducible and at risk for strangulation or incarceration, Dr. Al-Shami would have referred him to a general surgeon for surgical repair. (*Id.*)

Swisher indicates he was "told by Jail personnel that it was against policy to give me a double mattress for my back" and that "[m]edical personnel refused to prescribe or reccomend [sic] a double mattress because it was against policy." (ECF 341-1 at ¶ 7.) Swisher has not indicated who told him it was against policy to give him a double mattress, or who refused to prescribe or recommend a double mattress. Dr. Al-Shami asserts that Swisher never asked him to order a second mattress. (ECF 332-1 at ¶ 17.) Dr. Al-Shami further asserts that, if the request had been made, he would have ordered one if he determined that it was necessary. (*Id.*)

Swisher concedes that he did not personally speak with Sheriff Lain about receiving inadequate medical care, but he believes his sister talked with Sheriff Lain. (ECF 339-2 at 45-46.) While at Porter County Jail, Swisher was never told that he could not see a doctor for his complaints. (ECF 339-2 at 61.) All medical decisions were made by Dr. Al-Shami or another Advanced Correctional Healthcare, Inc., physician, and Warden Widup relied upon those decisions. (ECF 339-3 at ¶ 10.) He was transferred to the Indiana Department of Correction on September 30, 2008, and Dr. Al-Shami was no longer involved in his care. (ECF 332-1 at ¶ 16; ECF 262 at ¶ 9.)

<u>Statute of Limitations</u>

The Porter County Defendants argue that most of Swisher's claims are barred by Indiana's two year statute of limitations.[13] Swisher's claims are brought pursuant to 42 U.S.C. § 1983, and the relevant statute of limitations for § 1983 claims is determined by looking to state law. *Wallace v. Kato*, 549 U.S. 384, 394 (2007). In Indiana, a two-year limitations period for personal injury suits applies to Section 1983 claims. *Behavioral Inst. of Ind., LLC v. Hobart City of Common Council*, 406 F.3d 926, 929 (7th Cir. 2005). Swisher mailed his complaint on August 11, 2010. (ECF 1 at 7.) Thus, the Porter County Defendants conclude that claims accruing prior to August 11, 2008, including Swisher's complaints about back pain, sinus headaches, foot pain, post-traumatic stress disorder, and most of Swisher's claims concerning his hernia and stomach pain, are barred. (ECF 339 at 11; ECF 343 at 8; ECF 344 at 5.)

The Seventh Circuit addressed a similar argument in *Heard v. Sheahan*, 253 F.3d 316 (7th Cir. 2001). In that case, the plaintiff filed a suit under 42 U.S.C. § 1983 claiming that prison officials engaged in cruel and unusual punishment by denying him medical care for his hernia. *Id.* at 317. The Seventh Circuit held that "[e]very day that [the prison officials] prolonged his agony by not treating his painful condition marked a fresh infliction of punishment that caused the statute of limitations to start running anew. A series of wrongful acts creates a series of claims." *Id.* at 318. Therefore, although the

---

[13] The Medical Defendants do not raise this argument in either their summary judgment motion or their memorandum, although they do raise the issue in their reply brief. (ECF 343 at 8.) Arguments cannot be raised for the first time in a reply brief. *Hess v. Reg-Ellen Machine Tool Corp.*, 423 F.3d 653, 665 (7th Cir. 2005). Accordingly, they have waived this argument.

initial request for care was made before the two-year limitation, the continuous pain and the subsequent refusal to provide care restarts the statute of limitations. *Id.* at 319. *See also Cesal v. Moats*, 851 F.3d 714, 722 (7th Cir. 2017)(applying *Heard* where plaintiff alleged ongoing injuries due to deliberate indifference to medical needs). As long as jail officials are aware of the inmate's need for treatment and refuse to act, the refusal continues as long as the officials had the power to act, up until the inmate leaves the jail. *Devbrow v. Kalu*, 705 F.3d 765, 770 (7th Cir. 2013).

It is Swiser's burden to demonstrate that each of his claims against the Porter County Defendants are timely. Swisher suffers from several chronic conditions that pre-dated his arrest: back pain, sinus headaches, foot pain, and post-traumatic stress disorder. (ECF 341-1 at ¶ 7.) Before his incarceration, Swisher saw several specialists for these chronic conditions. (*Id.*) But, there is no evidence before this court that Sherriff Lain had any knowledge of Swisher's medical complaints at any point during his incarceration at the Porter County Jail. Swisher admits that he never spoke with Sheriff Lain regarding his medical care or health issues. (ECF 339-2 at 45-46.) But, Swisher claims that Sheriff Lain was advised of his inadequate medical care by his sister, Bonnie Work. (ECF 339-2 at 45.) Swisher produced no statement from Bonnie Work. In fact, Swisher does not even tell the court what Bonnie Work said to Sheriff Lain. At his deposition, he stated that: "The sheriff was advised by my sister. I believe my sister. If not by my sister, by paperwork documentation . . . ." (ECF 339-2 at 45.) This might invite speculation that Sheriff Lain knew something, but it is not evidence of what Sheriff Lain knew. While Rule 56(c) allows a statement presented in an inadmissible

form to be considered so long as it could be presented in an admissible form at trial, there is simply no statement by Bonnie Work for the court to consider.

Swisher also claims that Sheriff Lain knew of his circumstances through paperwork. More specifically, an Emergency Petition for Bond Reduction Swisher filed on June 2, 2003, in Porter Superior Court, and a Notice of Tort Claim Swisher filed against Sheriff Lain and others on June 22, 2008. (ECF 339-2 at 45-46; ECF 341-1 at 7-9.) But, Swisher merely assumes that these documents made their way to Sheriff Lain. There is no evidence before this court that Sheriff Lain actually saw either of these documents. The Emergency Petition for Bond Reduction was filed in Swisher's criminal case, and Swisher has not explained why he believes Sheriff Lain would have any occasion to see it. Moreover, the Notice of Tort Claim complains of not getting adequate medical care, but it does not describe any particular medical issue. Thus, Swisher has not demonstrated that Sheriff Lain had any knowledge of his complaints at any point prior to his transfer to an Indiana Department of Correction facility. Accordingly, Swisher's claims against Sheriff Lain are barred by the statute of limitations.

Warden Widup did have knowledge of some of Swisher's chronic medical complaints prior to August 11, 2008. Swisher has not indicated that he told Warden Widup about either his post-traumatic stress disorder or sinus headaches at any point during his incarceration at the Porter County Jail, but he did know about Swisher's back pain, foot pain, and hernia. Within a month of Swisher's March 2, 2008, request to see a chiropractor, Swisher let Warden Widup know he wanted to see a chiropractor. (ECF 339-2 at 57-58.) While Swisher has not provided a date, Swisher spoke to Warden

Widup about his foot pain and need for arch supports. (ECF 339-2 at 90.) Swisher

asserts that he complained of foot pain to Dr. Al-Shami at his appointment on April 7,

2008, and he does not allege that he raised this issue at any of his other three

appointments. (ECF 339-2 at 63.) Therefore, it can be reasonably inferred that Swisher

raised this issue with Warden Widup reasonably close to the April 7, 2008,

appointment. Warden Widup also knew about Swisher's hernia. Swisher spoke to

Warden Widup about his need to have his hernia treated. While Swisher does not give a

date, his testimony indicates that it was within days of May 5, 2008, not months. (ECF

339-2 at 72, 93.) Because Warden Widup knew about Swisher's back pain, foot pain and

hernia before August 11, 2008, and these conditions continued until Swisher's transfer

to the Indiana Department of Correction on September 30, 2008, these claims are not

barred by the statute of limitations.[14] Swisher's claims against Warden Widup based on

his post-traumatic stress disorder and sinus headaches are, however, barred because

Swisher has not produced facts supporting a conclusion that Warden Widup had

knowledge of these chronic conditions before he left the Porter County Jail.

Dr. Al-Shami

To establish liability under the Eighth Amendment,[15] a prisoner must show: (1)

his medical need was objectively serious; and (2) the defendant acted with deliberate

---

[14] While these claims are not barred by the statute of limitations, the claims will be dismissed on the merits. *See infra* pp. 24-26.

[15] Swisher was a pre-trial detainee when these events occurred. "Although the Eighth Amendment applies only to convicted persons, pretrial detainees . . . are entitled to the same basic protections under the Fourteenth Amendment's due process clause. Accordingly, [courts] apply the same legal standards to deliberate indifference claims brought under either the Eighth or Fourteenth Amendment." *Minix v.*

indifference to his medical need. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994.) A medical

need is "serious" if it is one that a physician has diagnosed as mandating treatment, or

one that is so obvious that even a lay person would easily recognize the necessity for a

doctor's attention, and if untreated could result in further significant injury or

unnecessary pain, and that significantly affects the person's daily activities or features

chronic and substantial pain. *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005).

Deliberate indifference is a high standard, and is "something approaching a total

unconcern for a prisoner's welfare in the face of serious risks," or a "conscious, culpable

refusal" to prevent harm. *Duane v. Lane*, 959 F.2d 673, 677 (7th Cir. 1992). As the Seventh

Circuit has explained:

> [C]onduct is deliberately indifferent when the official has acted in an intentional or criminally reckless manner, i.e., the defendant must have known that the plaintiff was at serious risk of being harmed and decided not to do anything to prevent that harm from occurring even though he could have easily done so.

*Board v. Farnham*, 394 F.3d 469, 478 (7th Cir. 2005).

For a medical professional to be held liable for deliberate indifference to an

inmate's medical needs, he must make a decision that represents "such a substantial

departure from accepted professional judgment, practice, or standards, as to

demonstrate that the person responsible actually did not base the decision on such a

---

*Canarecci*, 597 F.3d 824, 831 (7th Cir. 2010). *See also Phillips v. Sheriff of Cook Cty.*, 828 F.3d 541, 554 n. 31 (7th Cir. 2016) (clarifying that *Kingsley v. Hendrickson*, 576 U.S. __, __; 135 S.Ct. 2466 (2015) did not change the applicability of the Eighth Amendment standard to pre-trial detainee deliberate indifference claims).

judgment." *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008). As the Seventh Circuit has explained:

> [M]edical professionals are not required to provide proper medical treatment to prisoners, but rather they must provide medical treatment that reflects professional judgment, practice, or standards. There is not one proper way to practice medicine in a prison, but rather a range of acceptable courses based on prevailing standards in the field. A medical professional's treatment decisions will be accorded deference unless no minimally competent professional would have so responded under those circumstances.

*Id.* at 697-98. Negligence, incompetence, or even medical malpractice do not amount to deliberate indifference. *Pierson v. Hartley*, 391 F.3d 898, 902 (7th Cir. 2004); *Walker v. Peters*, 233 F.3d 494, 499 (7th Cir. 2000).

Furthermore, a prisoner is not entitled to demand specific care, nor is he entitled to the "best care possible." *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997). Where the defendants have provided some level of care for a prisoner's medical condition, in order to establish deliberate indifference the prisoner must show that "the defendants' responses to [his condition] were so plainly inappropriate as to permit the inference that the defendants intentionally or recklessly disregarded his needs." *Hayes v. Snyder*, 546 F.3d 516, 524 (7th Cir. 2008). A mere disagreement with medical professionals about the appropriate treatment does not amount to an Eighth Amendment violation. *Ciarpaglini v. Saini*, 352 F.3d 328, 331 (7th Cir. 2003). With these principles in mind, the court turns its attention to Swisher's claims against Dr. Al-Shami.

Swisher has produced no evidence that Dr. Al-Shami was deliberately indifferent to his medical needs stemming from his post-traumatic stress disorder. Swisher never told Dr. Al-Shami he had been diagnosed with post-traumatic stress disorder and Dr. Al-Shami did not witness Swisher exhibit symptoms of post-traumatic stress disorder. (ECF 332-1 at ¶ 17.) Dr. Al-Shami cannot be deliberate indifferent to medical needs when he is unaware of them. *Board*, 394 F.3d at 478.

Swisher has not produced evidence from which a reasonable fact-finder could find that Dr. Al-Shami was deliberately indifferent to his complaints of back pain. It is uncontested that Swisher's only written request for care due to back pain was a Medical Request Form asking to see a chiropractor on March 2, 2008, and that the request was not brought to Dr. Al-Shami's attention. (ECF 339-2 at 54-55; ECF 339-4 at 10; ECF 339-1 at ¶ 10.) Swisher asserts that he told Dr. Al-Shami about his back pain during later visits and that Dr. Al-Shami told Swisher he would not refer him to a specialist. (ECF 339-2 at 56-57, 63; ECF 341 at 1.) But, Swisher provides no detail about the nature of his back pain or what he conveyed to Dr. Al-Shami about his back pain. The only facts before this court are that Swisher had back pain, Dr. Al-Shami knew he had back pain, and Dr. Al-Shami refused to provide treatment or send him to a specialist. (ECF 339-2 at 56-57; ECF 341 at 1.) But, Swisher has not demonstrated that Dr. Al-Shami's knowledge of his back pain made a wait-and-see approach unreasonable. Eight out of ten people suffer from back pain at some point, and it usually goes away on its own. https://medlineplus.gov/backpain.html (last visited March 15, 2018). Swisher is entitled to medical care that does not violate the constitution, but he is not entitled to

demand specific care. *Forbes*, 112 F.3d at 267. Taking the facts in the light most favorable to Swisher, no reasonable fact-finder could find that no "nominally competent professional" would have responded as Dr. Al-Shami did to Swisher's complaints of back pain. *See Jackson*, 541 F.3d at 697.

Swisher also has not produced evidence from which a reasonable fact-finder could find that Dr. Al-Shami was deliberately indifferent to his foot pain. Swisher's April 4, 2008, Medical Request Form indicated that he needed care for foot pain and an infection, but there is no evidence that Dr. Al-Shami saw this form. (ECF 339-4 at 12.) Swisher alleges that he made Dr. Al-Shami aware of his foot pain during his appointment on April 7, 2008, and that Dr. Al-Shami did not prescribe anything and refused to send him to a specialist. (ECF 339-2 at 63; ECF 341 at 1.) As with his allegations regarding back pain, Swisher does not produce any evidence of what he told Dr. Al-Shami beyond the fact that he had foot pain. It is undisputed that Dr. Al-Shami never observed Swisher having difficulty ambulating. (ECF 332-1 at ¶ 17.) Swisher saw Dr. Al-Shami on May 5, 2018, and August 25, 2008, but Swisher does not assert that he told Dr. Al-Shami he continued to have foot pain at either of those appointments. (ECF 339-4 at 19, 25.) Taking the facts in the light most favorable to Swisher, no reasonable fact-finder could find that no "nominally competent professional" would have responded as Dr. Al-Shami did to Swisher's one-time complaint of foot pain. *See Jackson*, 541 F.3d at 697.

Likewise, no reasonable fact-finder could find that Dr. Al-Shami was deliberately indifferent to Swisher's pain from sinus headaches based on the record before this

court. Swisher asserts that he told Dr. Al-Shami of his sinus headaches on April 7, 2008. (ECF 341 at 1.) He does not offer any further detail. The medical records demonstrate that Dr. Al-Shami prescribed an antihistamine (CTM) on April 7, 2008. (ECF 332-1 at ¶ 12; ECF 339-4 at 14.) Dr. Al-Shami claims that Swisher complained of sinus headaches only at the August 25, 2008, appointment. (ECF 332-1 at ¶¶ 15, 17.) Dr. Al-Shami further asserts that Swisher asked him about prescribing a particular medication for his sinus headaches. (ECF 332-1 at ¶ 15.) It is undisputed that on August 25, 2008, Dr. Al-Shami prescribed Tylenol, Ibuprofen, and Benadryl for Swisher's sinus headaches. (ECF 332-1 at ¶ 15; ECF 339-4 at 25.) Swisher did not seek care for his sinus headaches after August 25, 2008. There may simply be confusion about that date of the appointment at which Swisher sought care for sinus headaches, but even if Swisher complained on both April 7, 2008, and August 25, 2008, Swisher has not produced evidence from which a reasonable fact-finder could find that no "nominally competent professional" would have responded as Dr. Al-Shami did to his complaints of sinus headaches. *See Jackson*, 541 F.3d at 697.

Lastly, no reasonable fact-finder could find that Dr. Al-Shami was deliberately indifferent to Swisher's medical needs related to his hernia based on the record before this court. Swisher first sought care for his hernia on April 27, 2008, and he was seen by Dr. Al-Shami on May 5, 2008. (ECF 339-4 at 17, 19.) Swisher was diagnosed with a hernia measuring 5 centimeters by 5 centimeters, although Swisher's allegation that he looked eight or nine months pregnant suggests Swisher believed it was larger. (ECF 339-2 at 68-69; ECF 339-4 at 19, ECF 341 at 2.) Whatever size the hernia measured, it is

undisputed that it was reducible. (ECF 332-1 at ¶ 13.) Because it was reducible, Dr. Al-Shami did not think it needed to be surgically repaired. (*Id.*) Dr. Al-Shami ordered an Ace bandage and Tylenol. (*Id.*) The Ace bandage was not delivered to Swisher until May 29, 2008, but there is no indication that Dr. Al-Shami was responsible for that delay. (ECF 332-2 at 192.) Once the bandage was received, Swisher found that it did not work well for him because it rolled. (ECF 332-1 at ¶ 14.) As a result, Dr. Al-Shami ordered a hernia belt. (*Id.*) The hernia belt was provided on June 2, 2008. (ECF 332-2 at 193, 201-02; ECF 339-2 at 73; ECF 339-4 at 21.) Swisher made only one more request, on August 19, 2008, to see a physician while he was housed at the Porter County Jail. (ECF 339-4 at 23.) He saw Dr. Al-Shami on August 25, 2008. (ECF 339-4 at 25; ECF 339-2 at 79-80.) At that appointment, Swisher asked Dr. Al-Shami why he could not have his hernia repaired. (ECF 332-1 at ¶ 15; ECF 339-4 at 25.) Dr. Al-Shami explained that it did not need to be surgically repaired at that time. (*Id.*) There is no evidence that Swisher reported pain that was uncontrolled despite the Tylenol that Dr. Al-Shami prescribed on May 8, 2008. While Swisher asserts he did not receive treatment for his hernia, the record does not support that conclusion. It was not his preferred treatment and it was not provided by his preferred physician, but pre-trial detainees are not entitled to hand-pick their treatment or physicians. *See Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996)("[T]he Constitution is not a medical code that mandates specific medical treatment."). Furthermore, following Swisher's transfer to a different facility, he wore a hernia belt for seven years without having surgery. (ECF 339-2 at 74-76.) This suggests that Dr. Al-Shami's treatment decision was reasonable and consistent with the opinion

of the doctors that treated Swisher following his transfer to an Indiana Department of Correction facility. Swisher has produced no evidence to the contrary. No reasonable fact-finder could conclude that no "nominally competent professional" would have treated Swisher's hernia as Dr. Al-Shami did under these circumstances. *Jackson*, 541 F.3d at 697.

Swisher was never told he could not see a doctor. (ECF 339-2 at 61.) Yet, despite his many medical concerns, Swisher asserts that he only saw Dr. Al-Shami on four occasions during the roughly nine months he was housed at the Porter County Jail. He is critical of Dr. Al-Shami's treatment, but provides almost no details about what he told Dr. Al-Shami that would permit a reasonable fact-finder to determine that Dr. Al-Shami's care was negligent or incompetent, and a showing of deliberately indifferent requires a good deal more than a showing of mere negligence or incompetence. *Pierson*, 391 F.3d at 902; *Walker*, 233 F.3d 499. As noted earlier, summary judgment is the "put up or shut up moment." *See Springer*, 518 F.3d 479, 484 (7th Cir. 2008). Swisher has not presented facts from which a reasonable fact-finder could find that Dr. Al-Shami acted in an intentionally or criminally reckless manner in evaluating or treating Swisher's post-traumatic stress disorder, back pain, foot pain, sinus headaches, or hernia. Accordingly, summary judgment will be granted in favor of Dr. Al-Shami.

<u>Warden Widup</u>

Warden Widup is not a medical professional. The law encourages non-medical staff to defer to the judgment of medical personnel. *See Berry v. Peterman*, 604 F.3d 435,

440 (7th Cir. 2010). In *Burks v. Raemisch,* the Seventh Circuit rejected a prisoner's attempt to hold non-medical officers responsible for deficiencies in his medical care.

> The division of labor is important not only to bureaucratic organization but also to efficient performance of tasks; people who stay within their roles can get more work done, more effectively, and cannot be hit with damages under § 1983 for not being ombudsmen. Burks's view that everyone who knows about a prisoner's problem must pay damages implies that he could write letters to the Governor of Wisconsin and 999 other public officials, demand that every one of those 1,000 officials drop everything he or she is doing in order to investigate a single prisoner's claims, and then collect damages from all 1,000 recipients if the letter-writing campaign does not lead to better medical care. That can't be right. The Governor, and for that matter the Superintendent of Prisons and the Warden of each prison, is entitled to relegate to the prison's medical staff the provision of good medical care.

*Burks v. Raemisch,* 555 F.3d 592, 595 (7th Cir. 2009). Furthermore, "[a] layperson's failure to tell the medical staff how to do its job cannot be called deliberate indifference; it is just a form of failing to supply a gratuitous rescue service." *Id.* at 596.

Warden Widup knew about Swisher's back pain, foot pain, and hernia because Swisher spoke with Warden Widup about those concerns. (ECF 339-2 at 43, 93; ECF 341-1 at ¶ 6.) Warden Widup may also have learned of these medical issues from his son, Ian Widup, or Swisher's sister, Bonnie Work. (ECF 339-2 at 47-48, 72, 92-93; ECF 341-1 at ¶ 6.) But, what Warden Widup knew is less clear. Swisher does not tell the court what either he or Bonnie Work told Warden Widup. He merely makes conclusory statements that he and Bonnie Work told Warden Widup about these concerns. Swisher spoke with Warden Widup on only a few occasions. (ECF 339-2 at 47-48, 57-58, 72, 90-93.)

According to Swisher, Warden Widup's response to his medical concerns was always "I'll talk to medical and get it taken care of." (ECF 339-2 at 66.) When a non-medical defendant takes his concerns to the medical staff, that is not deliberate indifference. *Burks*, 555 at 596. When Swisher talked to Warden Widup about seeing a chiropractor, he was told that specialists do not come to the jail. (ECF 339-2 at 57-58.) Warden Widup did not tell Swisher that he could not see a specialist even if it was medically necessary; he told him only that specialists do not come to the jail. This does not demonstrate deliberate indifference. Warden Widup made treatment available to Swisher through Advanced Correctional Healthcare Corporation, and Swisher did in fact receive treatment while housed at the jail. Warden Widup has indicated that he relied upon the decisions of Dr. Al-Shami and other physicians employed by Advanced Correction Healthcare Corporation. (ECF 339-3 at ¶ 10.) Warden Widup is entitled to defer to the judgment of the medical staff treating Swisher. *Berry,* 604 F.3d at 440. There are no facts before this court that demonstrate Warden Widup ignored Swisher or that he possessed any information that would render his deference to the medical staff's treatment of Swisher's back pain, foot pain, or hernia unreasonable.

<u>Porter County Sheriff's Department and Advanced Correctional Healthcare Corporation</u>

A municipality may only be held liable for constitutional violations caused by the municipality through its own policy, practice, or custom. *Monell v. Dep't of Soc. Servs. of the City of New York*, 436 U.S. 658, 694, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978). To recover under *Monell*, a plaintiff must establish that: (1) he suffered a deprivation of a federal right (2) as a result of an express municipal policy, a widespread custom, or a

deliberate act of a decision-maker with final policymaking authority for the municipality that (3) was the proximate cause of his injury. *King v. Kramer*, 763 F.3d 635, 649 (7th Cir. 2014). A private company performing a state function, such as Advanced Correctional Healthcare Corporation, can be held liable to the same extent as a municipal entity under *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978). *See Rice v. Corr. Med. Servs.*, 675 F.3d 650, 675 (7th Cir. 2012) (*Monell* framework applies to private company providing medical care at correctional facility). However, "a municipality cannot be liable under *Monell* when there is no underlying constitutional violation by a municipal employee." *Sallenger v. City of Springfield Ill.*, 630 F.3d 499, 504 (7th Cir. 2010). Swisher has not presented facts from which a reasonable fact-finder could find that Dr. Al-Shami, Warden Widup, or Sheriff Lain violated any of his constitutional rights. Accordingly, the Porter County Sheriff's Department and Advanced Correctional Healthcare Corporation must be dismissed.

For these reasons, the court GRANTS the defendants' summary judgment motions (ECF 331 and 338) and DIRECTS the clerk to enter judgment in favor of the defendants and against the plaintiff.

SO ORDERED on March 20, 2018

 s/Michael G. Gotsch, Sr.
Michael G. Gotsch, Sr.
United States Magistrate Judge